109 N.J. Super. 351 (1970)
263 A.2d 188
STANLEY YACKER, RECEIVER FOR MAR BUILDING, INC., PLAINTIFF,
v.
MARKUS WEINER, MARTIN BLASHINSKY AND MIDDLESEX APARTMENTS, INC., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided March 6, 1970.
*353 Mr. Ralph S. Heuser appeared for plaintiff (Messrs. Heuser & Heuser, attorneys).
Mr. Barry D. Keith appeared for defendants (Messrs. Keith & Keith, attorneys).
*354 LANE, J.S.C.
Plaintiff, the receiver of Mar Building Co., Inc. (improperly referred to in the title as Mar Building, Inc.; referred to herein as Mar), an insolvent construction corporation, seeks to recover monies diverted from the corporation by Markus Weiner (Weiner) and Martin Blashinsky (Blashinsky), its former officers, and to pierce the corporate veil of Mar so as to hold Middlesex Apts., Inc. (Middlesex), the owner of the realty, responsible for obligations due from Mar to certain creditors. The matter is before the court on final hearing.
Middlesex was formed January 26, 1965. The incorporators were Weiner, Blashinsky and Sarah Bernstein, each of whom subscribed to 60 shares of stock, and Julius and Estelle Greenman who together subscribed to 30 shares. Mar was incorporated January 28, 1965. The incorporators, with equal shares of stock, were Blashinsky, Weiner and Bernstein. The same attorney incorporated both corporations.
Middlesex acquired title to land in Matawan, New Jersey, upon which Mar was to construct an apartment project. A contract was entered into between Mar and Middlesex on March 3, 1965 under which Mar was to do the construction for $680,000. Middlesex obtained from The Dime Savings Bank of Brooklyn a construction and permanent loan in the amount of $825,000. It was the intention of Blashinsky and Weiner to mortgage out the entire job, including the cost of the land, using none of their own money.
The amount paid by Middlesex for the land and other items exclusive of construction was $148,571.20. The total cost of the land and buildings to date was $968,939.42.
As of 1968 the cost of the building had been $806,000. There were, however, $141,153.01 of claims asserted by contractors against Mar for work done in the construction. With the exception of three creditors, these claims have been settled by Middlesex on the basis of 25 cents on the dollar. The three creditors who refused to settle are the receiver of Charles J. Rooney Plumbing & Heating, Inc., Ace-Manzo, Inc. and Manzo Contracting Co., Inc. At the trial of this *355 case defendants not only denied liability but also vigorously contested the validity and amount of the claims of the three creditors.
The theory upon which plaintiff proceeds against Middlesex is that a fraud was committed at the time the contract was signed with Mar for the construction of the building. It is contended that Blashinsky and Weiner, the active principals of Middlesex, must have known that the buildings could not possibly have been built for $680,000. Testimony was given by a well-qualified builder that anyone computing the probable cost for the construction of the buildings in 1965 would have arrived at a figure in the neighborhood of $900,000. Defendants sought to counteract that testimony by offering testimony of their own building expert. He testified that $703,000 ($23,000 over the contract price) would have been a valid estimate of costs. That figure, however, did not include anything for organization expenses, legal fees, temporary heat, electricity, salaries, or profit to the corporation. Testimony was also offered by defendants from an accountant who represented one of the investors in Middlesex and Mar and also Middlesex itself. He testified that from his examination of the contracts entered into and estimates that he saw for certain supplies such as lumber, masonry and hardware, the total cost was to have been $680,170. However, in such computation one of the contracts (Weiner Electric Co.) was taken at $10,000 less than its actual figure, and the amounts estimated for some of the suppliers were unreasonably low. Again no consideration was given to organization expenses, legal fees, temporary heat, electricity, salaries, or profit to the corporation. It is perfectly clear to the court that the contract price of $680,000 had no relationship to what the actual cost of construction was going to be. The court discounts the effect of the accountant's testimony because most of the contracts were entered into well after the contract between Middlesex and Mar and therefore they could not have been in Blashinsky's and Weiner's contemplation when the $680,000 contract price was arrived at.
*356 The case presents a situation that all too often is seen. One or more persons organize a corporation to buy land and another corporation to enter into a construction contract which has little or no relationship to estimated costs of the work to be performed. That contract provides that no stop notices will be filed. The construction company, completely controlled by the people who own the real estate holding company, then enters into subcontracts for a major portion of the work. If the construction company can get away with it, its subcontracts prohibit any recourse to the Mechanics Lien Law. The amount of the general contract is grossly inadequate, the incorporators of the two corporations keeping from the mortgage funds the costs of the land, interest to be paid on the mortgage, organization costs of the landowning corporation and a profit to the incorporators. Inevitably, the construction company becomes insolvent, the subcontractors are not paid, and the incorporators grow fat on the work, labor and materials put in the project by the subcontractors who end with a claim against the insolvent construction corporation.
It is fundamental that a corporation is an entity wholly separate and distinct from the individuals who compose and control it, but the corporate cloak may not be utilized as a subterfuge to justify wrong or perpetuate fraud. Frank v. Franks Inc., 9 N.J. 218, 223-224 (1952); Cohen v. Dwyer, 133 N.J. Eq. 226 (Ch. 1943), aff'd 134 N.J. Eq. 350 (E. & A. 1944); Miller & Dobrin, etc., Co. v. Camden Fire, etc., Assn., 55 N.J. Super. 205, 217 (Law Div. 1959); Schmid v. First Camden National Bank & Trust Co., 130 N.J. Eq. 254 (Ch. 1941).
In Macfadden v. Macfadden, 49 N.J. Super. 356 (App. Div. 1958), certif. den. 27 N.J. 155 (1958), the Appellate Division stated:
In Irving Investment Corp. v. Gordon, 3 N.J. 217, 223 (1949), the court said:
*357 "It is where the corporate form is used as a shield behind which injustice is sought to be done by those who have the control of it that equity penetrates the veil."
That statement connotes merely that there must be equitable fraud present to permit of such action. Fraud, in the sense of a court of equity, includes all acts, omissions or concealments which involve a breach of a legal or equitable duty, trust or confidence justly reposed, and are injurious to another, or by which an undue or unconscientious advantage is taken of another. Howard v. West Jersey & S.S.R. Co., 102 N.J. Eq. 517 (Ch. 1928), affirmed 104 N.J. Eq. 201 (E. & A. 1929); Riverside Trust Co. v. Collin, 114 N.J. Eq. 157 (E. & A. 1933). Plainly, the facts sustain the conclusion that the use of the corporate form is here fraudulent in the above sense. [at 360]
The subcontractors who entered into contracts with Mar were justified in assuming that the general contract was for an amount which reasonably could be expected to cover the cost of the construction of the buildings. Although the Middlesex-Mar contract was filed, it is unreasonable to expect each subcontractor and supplier to compute the cost of the whole job to determine if the general contract price was adequate. In forming Mar and in causing it to enter into a contract for a sum that could not possibly have covered the cost of the construction, Weiner and Blashinsky perpetrated a fraud upon the subcontractors and caused their corporation, Middlesex, to participate in the fraud. An undue and unconscionable advantage was taken by Middlesex of such subcontractors. Middlesex itself apparently recognizes its responsibility. $20,000 was loaned to Mar during the course of the construction by or through the attorney who organized the corporations. This amount was repaid by Middlesex. Middlesex undertook to negotiate with Mar's creditors and, in fact, settled with them for twenty-five cents on the dollar except the ones involved in this suit. There will be a judgment in favor of the receiver against Middlesex for the amount of the claims of the three creditors involved in this action.
The proof of claim filed by the receiver for Charles J. Rooney Plumbing & Heating, Inc. alleged that there was $16,000 due. Rooney had been engaged to complete the *358 plumbing on five buildings for an agreed sum of $5,000 per building. He completed three of the buildings but failed to complete fully the last two. He testified that he was paid $17,000 and claimed to be owed an additional $8,000. He admitted that he had not done all of the work called for. Defendants produced a series of checks of Middlesex which were dated in the latter part of 1966 and the early part of 1967. They allege that these were payments made to complete the plumbing that Rooney had failed to do. They admitted that some of the checks in 1967 could have been repairs which were never the obligation of Rooney. The total amount of the payments made for plumbing through 1966 to others than Rooney was $2,550.06. Defendants will be allowed a credit in that amount. The claim of the receiver for Rooney is established at $5,449.94, together with interest at 6% from December 31, 1966 through the date of payment.
The claim filed on behalf of Ace-Manzo, Inc. was in the amount of $8,013.15. The defense to that claim is that a portion of the work done by Ace-Manzo, Inc. was to be paid for by the municipality. The evidence shows that the contract was between Ace-Manzo, Inc. and Mar. There may well have been an agreement between Mar and the municipality for reimbursement to Mar by the municipality. Such agreement, however, does not constitute a defense to the Ace-Manzo, Inc. claim. The claim of Ace-Manzo, Inc. is established at $8,013.15, together with interest at 6% from May 2, 1966 to the date of payment.
The proof of claim filed on behalf of Manzo Contracting Co. was in the amount of $15,340. This contractor agreed to black-top certain parking areas at a specified unit price. The agreement between Manzo and Mar was that Manzo was to fine-grade the areas within a tolerance of two inches plus or minus and install four inches of stabilized base, black-top. After the installation, the parking areas began to crack. Manzo sought to explain the breaking up of the areas by saying that there was a water condition and *359 that Mar had agreed to put a top dressing over the stabilized base, which it did not do. It is also alleged that in fact four inches within a tolerance of two inches was put down. The evidence does not support Manzo. The only testimony as to a water condition was that of Manzo himself and an employee. Two independent experts testified on behalf of defendants that there was no water condition. The proof is clear that in many of the areas the stabilized base was less than two inches. The reasonable cost of correcting the condition was $7,500. The claim of Manzo Contracting Co., Inc. will be established at $7,840 together with interest at the rate of 6% from February 17, 1967 to the date of payment.
The claim against Blashinsky and Weiner individually by the receiver is rested upon a different basis. They are charged with wasting Mar's assets and mismanaging its business. See Knepper, Liability of Corporate Officers and Directors (1969), § 8.13, at 153.
In Cole v. Brandle, 127 N.J. Eq. 31 (E. & A. 1939), the Court of Errors and Appeals adopted the opinion of the vice-chancellor who stated:
* * * Here, defendants as officers of Investment Co., were trustees of corporate assets and as such were bound to administer such trust faithfully for the benefit of creditors as well as stockholders and they are charged with having been unfaithful to their trust in that they misapplied such assets willfully, in fraud of creditors. * * * [at 37]
See also Havey v. Hofmann, 121 N.J. Eq. 523 (Ch. 1937), aff'd o.b. 123 N.J. Eq. 589, 123 N.J. Eq. 590 (E. & A. 1938); Whitfield v. Kern, 122 N.J. Eq. 332 (E. & A. 1937).
Plaintiff contends that Blashinsky and Weiner, as the controlling officers of Mar, caused it to make improper payments. Among the improper payments were loans made to themselves. Such loans were prohibited by the statute in effect at the time, N.J.S.A. 14:8-10. Other expenditures that were made by Mar included $30,000 paid to Blashinsky *360 and Weiner for another building project in which they were interested. A payment of $5,000 was made to the attorney who incorporated Mar. Such payment was clearly excessive for legal services in forming the corporation. The formation of the corporation was rudimentary. The minutes of the first meeting of incorporators were not even complete. It is significant that in the checkbook the stub for the $5,000 check has $450 which is crossed out. Also, through this attorney Mar received a loan of $20,000. Whether the $5,000 is for a legal fee or for a bonus, its payment was gross mismanagement.
Although, as noted above, no figure was considered for salaries in the Middlesex-Mar contract, salaries were in fact taken by Blashinsky and Weiner. Since even under Blashinsky's and Weiner's attempted justification of the $680,000 contract figure, no consideration was given to salaries, the taking of salaries by them constituted waste and mismanagement. It is clear that they treated the assets of Mar as though they were their own personal property. There was no attempt to safeguard the assets or capital for the legitimate purpose of the corporation.
As to the withdrawal of $30,000 for the other building corporation, an attempt was made to show that $30,000 had been loaned by three individuals, all of whom were interested in Middlesex, to Weiner for use in the other construction project, but that Weiner improperly devoted the money to Mar, so that the withdrawal of $30,000 from Mar to the other construction project was merely an exchange. During the early part of the construction an accountant by the name of Samuel Fogel maintained the books of Mar. The general ledger was maintained through March 31, 1966. The cash receipts and disbursement book was maintained through November 1, 1966. Testimony offered by defendants as to the $30,000 transaction was at variance with the books. Although Fogel is alive, he was not produced at the trial nor was there any explanation given as to the failure to produce him. Although his office is in New York, he *361 was subject to having his deposition taken. The failure to produce Fogel even though the court had expressed its expectation that he would be produced raises an inference that defendants feared exposure of facts which would be unfavorable to them. State v. Clawans, 38 N.J. 162, 170 (1962). Defendants did offer the testimony of the accountant for Middlesex and for one of the investors in Mar. He had examined Mar's books in January of 1966. Notwithstanding the fact that he attempted to support the $30,000 alleged "exchange transaction," he had done nothing about having corrective entries made in Mar's books. The court accepts as true what is shown by the general ledger and the cash receipts and disbursements book of Mar, as opposed to the self-serving testimony given at the trial on defendants' behalf. The $30,000 expenditure is carried on the general ledger of Mar as a loan to the other construction project. There is no corresponding entry to show that it was an exchange.
The general ledger shows that the capital stock account of Mar totaled $37,300 made up as follows:

 June 1965 $ 9,000 Sarah Bernstein
 July 1965 10,000 not traceable
 Sep. 13, 1965 8,000 not traceable
 Oct. 1965 300 (Markus) Weiner
 5,000 Unger
 5,000 Fenster
 ________
 Total $37,300

There is also contained in the general ledger an entry for a loan in the amount of $20,000 to Mar by Fenster. Withdrawals from Mar for loans total $39,131.50. Thus, the entire capital was withdrawn.
In Kleinberg v. Schwartz, 87 N.J. Super. 216 (App. Div. 1965), aff'd o.b. 46 N.J. 2 (1965), the Court stated:
* * * The capital of a corporation is a "trust fund" and the directors, as trustees thereof, may not dispose of it to the prejudice of creditors without an equivalent consideration, and no stockholder is entitled to any share of it until all the debts are paid. * * * [at 223]
*362 The improper payments total $56,821.31 as appears by Schedule A attached hereto. [Schedule A is not printed. It lists the following categories: Salaries to officers, $9,941.98; Loans to officers, $4,500.00; Payments to or on behalf of Middlesex, $1,747.35; Attorney's fee, $5,000.00; Payments to other construction projects in which Weiner and Blashinsky had an interest, $34,119.00; Miscellaneous improper expenditures, $1,512.98.]
The fact that the claims of the three creditors in suit do not total $56,821.31 does not lessen the liability of Blashinsky and Weiner to the corporation. There undoubtedly are at least claims against Mar for taxes by both the United States and the State of New Jersey as well as the expenses of the receivership proceedings. After the payment of the remaining creditors, the balance of the assets of the insolvent corporation in the hands of the receiver will be distributed in accordance with N.J.S.A. 14:13-8.
There will be a judgment in favor of the plaintiff and against Blashinsky and Weiner individually, jointly and severally, in the amount of $56,821.31 with interest at 6% from September 9, 1966, the date of the last improper withdrawal with costs. There will be a judgment against Middlesex for the amount of the Rooney, Ace-Manzo, Inc. and Manzo Contracting Co. claims with costs. The primary fund from which these three claims are to be paid is the proceeds of the judgment against Blashinsky and Weiner. The plaintiff, however, may proceed against Middlesex without first exhausting its remedies against Blashinsky and Weiner. To the extent that Middlesex pays the plaintiff under this judgment, it will be subrogated to the plaintiff's judgment against Blashinsky and Weiner.
The attorney for the plaintiff will submit a judgment embodying the views set forth herein within 10 days in accordance with R. 4:42-1.